## Rapp v. Behm

*Robert L. Lansberry,* for plaintiff.
*James C. Bowen,* for defendant.

BIESTER, JR., *J.,* November, 16, 1981—This survival and wrongful death action arises out of an accident in which a motorcycle operated by decedent collided with a tow truck owned and operated by defendant.

At trial, the court submitted special interrogatories to the jury. The jury found that defendant was negligent, that his negligence was a substantial factor in causing the accident, and that decedent was not contributorily negligent.

The jury then awarded damages to plaintiff in the sum of $62,500 in the wrongful death action, and $122,418 in the survival action. Pursuant to Pa.R.C.P. 238 and upon application of plaintiff, the court increased the verdict by ten percent per annum, simple interest for the period from December 15, 1979 to October 30, 1980.

In his motion for new trial defendant has raised several issues regarding both the jury award of damages and the Rule 238 damages. This case was argued before the court en banc.

The trial errors alleged by defendant are:

1. Permitting plaintiff's economic expert to testify regarding decedent's lost earning capacity when there was an inadequate evidentiary foundation for the expert's opinion.

2. Permitting plaintiff's economic expert to use economic statistics to estimate decedent's lost future earnings and productivity increases.

3. Awarding plaintiff Rule 238 "delay" damages when plaintiff was responsible for some pre-trial delays.

4. Awarding plaintiff Rule 238 "delay" damages, as Rule 238 is unconstitutional.

We shall treat the issues seriatim.

Defendant asserts that the court erred in permitting plaintiff's economics expert to testify regarding decedent's lost future earnings. Defendant argues that an improper foundation was laid for the witness' opinion, citing Kaczkowski v. Bolubasz, 491 Pa. 561, 421 A. 2d 1027 (1980).

Defendant complains that Kaczkowski requires evidence of six factors before an expert's opinion of decedent's future productivity is admissible. Those factors are (1) education of decedent; (2) decedent's employment history; (3) opinion of decedent held by fellow workers; (4) decedent's express employment goals; (5) potential jobs for which decedent is qualified in the area where decedent lived or intended to work; and (6) employment history of another individual in the same field with the same background as decedent.

Defendant further contends that plaintiff only produced evidence concerning the first three factors and therefore plaintiff's expert should not have been permitted to testify as to decedent's future lost earnings.

We do not read Kaczkowski as requiring evidence of all or any of the above recited factors as a condition precedent to expert testimony of lost future earnings. The Supreme Court's opinion mentions these particular factors only in describing the evidentiary information available to the expert in Feldman v. Allegheny Airlines, Inc., 382 F. Supp. 1271 (D. Conn. 1974) aff'd, 524 F. 2d 384 (2d Cir.

1975). There is no indication whatsoever in the Kaczkowski opinion that all of these factors are a prerequisite to expert testimony regarding future earnings or productivity. No such brittle test is set forth in Kaczkowski and such a brittle application of any such language in Kaczkowski would distort the tenor of that decision and frustrate its salutory effect. In fact evidence of these six factors was not present in Kaczkowski itself.[1]

While the court did adopt the "evidentiary approach" of Feldman in computing damages for lost future earnings, the Kaczkowski decision does not prescribe an essential catalogue of particular evidentiary bases for expert testimony. The "evidentiary approach" that the Supreme Court adopted in Kaczkowski simply permits, inter alia, the use of expert testimony in considering the effects of future productivity on lost future earnings.[2]

Rather than adopt a mechanistic approach patterned on the particular evidence available in Feldman, the court in Kaczkowski ruled that "[a]n individual's future earning capacity is capable of estimation based upon objective factors of age,

---

1. The victim in Kaczkowski was a student preparing for a career in computer management, 491 Pa. 563, 421 A. 2d 1028. There was apparently no evidence of his employment history; opinion by fellow workers (as opposed to fellow students) employment potential in any particular geographic area or employment history of another individual in the same field with the same background, *Id.*

2. The "evidentiary approach" to assessing lost earnings is distinguished from the "traditional approach" pursuant to which no evidence of future productivity increases is admissible, and the "middle ground approach" pursuant to which evidence of future productivity increases is admitted, but expert testimony is prohibited: Kaczkowski, supra, 491 Pa. 575-76, 421 A. 2d 1035.

maturity, education and skill." 491 Pa. 573-574, 421 A. 2d 1033.

In the present case, decedent's employer, Mr. Taylor testified that the 20 year old decedent was a high school graduate and had supplemented his education by attending automotive repair training seminars sponsored by manufacturers. Decedent had worked for Mr. Taylor part-time for his first two years of high school and full time thereafter. In addition, Mr. Taylor testified that decedent was licensed by the Commonwealth to inspect both automobiles and motorcycles. Mr. Taylor described decedent as the best worker he had ever had.

Mr. Taylor also testified that decedent was earning $4.00 per hour at the time of his death, but that under a new pay system put into effect shortly thereafter, decedent would have been earning $17,000 to $18,000 per year by the time of trial. Under the new pay system, mechanics were paid 60 percent of the rate charged to customers for repairs. Because the amount that customers were charged was based on manufacturer's estimated repair time, a mechanic who could "beat" the manufacturer's estimate could earn considerably more money than if he were a paid a flat hourly rate.

Decedent's father confirmed the educational background of decedent and testified that his son worked hard, saved his money and lived fairly frugally.

Dr. Andrew G. Verzilli, Ph.D., professor of economics at Drexel University testified to decedent's future earning capacity. Due to the brief earning history of decedent, Dr. Verzilli felt constrained to supplement decedent's personal income figures with productivity indices prepared for the United States government as well as with productivity information for Taylor Motors.

In light of the above, we hold that there was an adequate factual background prepared for expert testimony on future earning potential. There was ample, reliable evidence of decedent's "age, maturity, education and skill." In addition, the testimony concerning decedent's work habits, maintenance costs, past earnings and earnings projected up to the time of trial presented plaintiff's expert with a clear, uncontested "evolving pattern" of decedent's life. See Kaczkowski, at p. 577, 421 A. 2d 1035. Nothing in the Kaczkowski decision or any other decision of which we are aware,[3] suggests that a greater foundation is necessary before an expert's projection of a victim's lost earnings is admissible.

Defendant further argues that the court erred in permitting plaintiff's economic expert to testify regarding decedent's lost future earnings where such testimony was based, in part, upon "general" economic statistics.

Dr. Verzilli estimated decedent's lost earning capacity by employing (1) principles of economics; (2) decedent's personal background data; (3) methodology of statistics. Dr. Verzilli first calculated decedent's lost wages up to the time of trial, utilizing only the rate of increase actually experienced by decedent in the course of his employment. Using decedent's probable 1980 earnings as a base, Dr. Verzilli then calculated decedent's lost future earnings.

In estimating decedent's lost earnings, Dr. Verzilli applied a productivity increase of three per-

---

3. See e.g., Weaver v. Ford Motor Co., 382 F. Supp. 1068, 1075 (E.D. Pa. 1974) aff'd, 515 F. 2d 506, 507 (3d. Cir. 1975) (ample evidence of 5 year old decedent's intelligence, health, and likelihood of receiving college education to support recovery for lost earning capacity).

cent. Use of a "productivity factor" is based on the assumption that a worker's productivity increases with experience at a given job and with technological improvements, and further that this increased productivity will result in higher wages for the employe: Henderson, Income Over the Life Cycle, Some Problems of Estimation and Measurement, 25 Fed. Ins. Coun. Q 15, 26-28 (1974). See also Kaczkowski, supra, 491 Pa. 565, n. 5, 421 A. 2d 1029 n. 5.

The three percent productivity factor that Dr. Verzilli applied in the present case was based upon (1) decedent's earning history at Taylor Motors; (2) productivity information from Taylor Motors; (3) productivity increases in the American economy since 1900; (4) productivity indices for related industries;[4] and (5) productivity data for repair shops in the Philadelphia area. None of the productivity information used by Dr. Verzilli included inflation.

Based upon this information, Dr. Verzilli estimated a productivity increase range of two and one-half percent to three and one-half percent per year, and adopted an average rate of three percent. Applying this yearly rate of expected increase to decedent's estimated 1980 salary of $10,150, Dr. Verzilli estimated that decedent would have earned $857,590 until retirement at age 65.

Axiomatically, in a wrongful death or survival action, to arrive at a figure for decedent's net lost future earnings, the estimated personal maintenance costs must be deducted from decedent's estimated gross earnings: Incollingo v. Ewing, 444 Pa. 263, 309, 282 A. 2d 206, 229 (1971). Therefore,

---

4. The related industries were retail gasoline service outlets and automobile manufacturing.

Dr. Verzilli also computed a personal maintenance factor for decedent. Again, due to decedent's youth, Dr. Verzilli did not rely solely upon decedent's past maintenance expenses which totaled only about 26 percent of gross income. Rather, Dr. Verzilli used figures from the Bureau of Labor Statistics for an individual of decedent's income with a moderate standard of living and arrived at a personal maintenance factor of 50 percent. Applying the maintenance factor to decedent's estimated gross earning capacity, Dr. Verzilli estimated decedent's net lost future earnings at $438,652.

Prior to 1980, statistical evidence of probable increases in victim's future earning capacity was inadmissible in Pennsylvania to ascertain lost future wages: Havens v. Tonner, 243 Pa. Superior Ct. 371, 365 A. 2d 1271, (1976); Vizzini v. Ford Motor Co., 569 F. 2d 754, 768 (3d Cir. 1977). But see Rispo v. Motor Freight Express, 74 D. & C. 2d 59, (1975), (economic expert's testimony as to future loss of earnings which included increase rate based upon national economic statistics admissible).

In 1980, however, the Pennsylvania Supreme Court overruled Havens and held that victim's future productivity distinguished from inflation was a relevant consideration in awarding damages for lost future earnings: Kaczkowski, supra, 491 Pa. 583, 421 A. 2d 1038 (1980). Further the court adopted the "evidentiary approach" to assessing lost productivity. As noted previously one distinguishing feature of the evidentiary approach is the use of expert economic testimony. See note 2 supra. See also, Comment: Future Inflation, Prospective Damages and Circuit Courts, 63 Va. L. Rev. 105, 108-109 (1977); Note: Considering Inflation in Calculating Lost Future Earnings, 18 Wash. L.J. 499, 505 (1979).

Defendant argues that the Kaczkowski decision does not permit the use of general economic statistics to arrive at a "productivity factor." While defendant's position is not entirely clear, presumably defendant would restrict evidence of the victim's future productivity *solely* to evidence of the *victim's* past earnings increase.

The Kaczkowski decision, far from prohibiting the use of general economic data, appears to endorse the use of such information in computing lost future earnings.

The proffered testimony at issue in Kaczkowski included the use of general economic statistics of the type used here by Dr. Verzilli. The Kaczkowski expert proposed to incorporate in his projection of the victim's future earning capacity estimates for the impact of both inflation and productivity issues: 491 Pa. 563, 421 A. 2d 1029. These factors were apparently calculated by reference to general economic data. The Supreme Court held that the trial court erred in excluding such testimony:

". . . inflation and productivity factors are not speculative and are capable of definition and prediction by economic experts. For decades, economists have been refining tools to forecast economic growth and have used these tools with proven accuracy. Sophisticated economic forecasts are relied upon by every major government agency, corporation, and financial institution. These forecasts are based upon all that is known in the American economy and despite small tolerances of error, these projections have been accurate in he past. See, District of Columbia v. Barriteau, D.C. App., 399 A. 2d 563, 566 (1979). Thus, there exists a reasonable basis in fact for this court to consider the impact of inflation and productivity on lost earn-

ings. A court has a responsibility to the citizenry to keep abreast of changes in our society. *In light of the recognized acceptance of the science of economics, the courts of this Commonwealth can no longer maintain their ostrich-like stance and deny the admissibility and relevancy of reliable econcomic data concerning the impact of productivity and inflation on lost future earnings.* Indeed to ignore economic realities and presume that there will be no changes in an individual's future earnings because of such factors is further removed from reality than any variance that may result from our efforts to predict these factors." Kaczkowski, supra, 491 Pa. at 572, 421 A. 2d at 1032-33. (Emphasis supplied).

Keeping in mind, as did the court in Kaczkowski, that proof in support of claims for damages need not "conform to the standard of mathematical exactness," 491 Pa. 567, 421 A. 2d 1030, quoting from Lach v. Fletch, 361 Pa. 340, 352, 64 A. 2d 821, 827 (1949), and that data may be legally sufficient if it affords ". . . a reasonably fair basis for calculating how much plaintiff's are entitled to . . .," 491 Pa. 567, 421 A. 2d 1030, quoting from Western Show Co., Inc. v. Mix, 308 Pa. 215, 162 A. 2d 667 (1932) we find that permitting the use of general economic indices of productivity in computing lost future earnings was quite proper.

As required by Kaczkowski, Dr. Verzilli did not consider the effects of inflation in calculating decedent's lost future earnings. Dr. Verzilli used relevant and reliable productivity statistics from several recent economic studies, including data from decedent's employer's business. This data indicated that a narrow range of between two and one-half percent or three and one-half percent an-

nual productivity increase could be expected. In light of decedent's brief employment history, such a careful use of "general" economic statistics was an appropriate way to avoid "mere guess or speculation" in calculating decedent's lost future earnings.

Defendant also argues that awarding plaintiff damages under Pennsylvania Rule of Civil Procedure No. 238 was improper because plaintiff was responsible for some of the pre-trial delay. Defendant asserts that plaintiff was dilatory in complying with certain discovery requests.

Defendant misconstrues the policy objectives behind Rule 238. Rule 238 provides for court imposition of delay damages of 10 percent per annum, simple interest of the compensatory damages verdicts in any action seeking monetary relief for bodily injury, death or property damage: Pa.R.C.P. 238(a). Damages are computed from the later of the date plaintiff filed the initial complaint or a date one year after the cause of action accrued until the date of the award, verdict or decision: Pa.R.C.P. 238(a)(2).

Subsection (3) of Rule 238 provides the only exceptions. To avoid the imposition of delay damages prior to trial, defendant must make and keep open a written offer of settlement for a specified cash sum, which sum is exceeded by the eventual verdict by less than 125 percent: Pa.R.C.P. 238(3).

The rule itself does not make any distinction for dilatory plaintiffs. In fact, the provision of Rule 238 relating to additional defendants clearly demonstrates that the parties' conduct (other than with respect to defendant's settlement offers) is irrelevant for purposes of assessing damages. Under subsection (c) of the Rule, damages must be assessed against all defendants found liable, regardless of when they were joined in the action. Obvi-

ously, under the computation formula provided in subsection (a) of the Rule, defendants may be liable for "delay damages" computed from before they were named as defendants.

The provisions of Rule 238, outlined above as well as the Advisory Committee's explanatory note make clear that the dominant purpose is not to punish pre-trial dilatory tactics, but to encourage early settlement of tort cases. See Goodrich-Amram 2d §238:1. See also Salat v. Western Pennsylvania Hospital, 13 D. & C. 3d 82 (1980), (Rule 238 provides no exception for delays due to court congestion beyond defendant's control since major purpose of the rule is to reduce congestion by encouraging early settlements). Therefore, the fact that plaintiff was responsible for some pre-trial delay is immaterial for purposes of awarding damages under Rule 238.

Finally, defendant urges this court to hold Rule 238 invalid as violative of both the Federal and Pennsylvania Constitutions.■

. . .

We therefore enter the following

## ORDER

And now, November 16, 1981, it is hereby ordered, directed and decreed that defendant's motion for a new trial is denied.